This is a video of Sony Computer version 1.1.1.1.1.1.1.1.1.1.1.1. 1.1.1.1.1.1.1.1.1.1.1.1. 1.1.1.1.1.1.1.1.1.1.1.1. 1.1.1.1.1.1.1.1.1.1.1.1.1.   1.1.1.1.1.1.1.1.1.1.1.1.1.1.1.1.1. one, two, three, four, five, six seven, eight. All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. This is it. Thank you, afternoon. This afternoon we are hearing the argument in the commercial corporation against Sony Computer, number 06-1354, Mr. Kurtz. Thank you, your honor. Good afternoon. Mr. Kurtz. Thank you. May the court grant the words for appellants, Sony Computer Entertainment America and Sony Computer Entertainment. For convenience, I'll refer to them as Sony collectively. We're here today because the district court erred by abusing its discretion in denying Sony's motion to set aside the verdict under Rule 60 D3. And primarily, your honors, the error related to one, an erroneous conclusion of the law. What the district court did in effect is import a materiality standard. A similar materiality standard that's in the new evidence provision of 60 D2 in weighing the evidence into the 60 D3 misconduct test that was at issue. And the district court did so by recognizing that there were violations of the Federal Rules of Civil Procedure, of the duty of disclosure requirements by emergency. But the court looked to see whether those errors were significant enough of a magnitude, what impact they would have had on the case. It was an error in law. 60 D3 does not have such a requirement. There is no analysis required or appropriate on the Ninth Circuit precedent or the United States Supreme Court rule. 60 D3 simply requires when misconduct is found, as it is found here and not disputed here, people leave the record. Then the test goes to one of whether the wrong party, the agreed party, had a full and fair opportunity to defend itself in court. But if, in fact, it didn't affect the result, the remedy that you're asking, nonetheless, would be a new trial? Your Honor, we were asking for a new trial. But not that it had no effect on the result. What we're saying is we'll never know. We're a force to speculate, based on emergency misconduct in this case, what impact it would have had on the result. I can explain to you today, on Sony's behalf, precisely why we believe wholeheartedly that the impact was significant, that, in fact, it would have resulted in a different result, that Sony would have won a trial. And I'm sure Emergence Counsel can sit up here and articulate precisely why they would say, no, it wasn't much of an impact. It was a small part of our closing statement. There were certain documents granted that would have refuted statements that we made, that would have rendered certain closing statements to the jury false. So Sony's position would be clear. Yes, it would have had a dramatic impact. And Emergence would be, no, it wouldn't. But the test isn't weighing and determining what impact it would be. Once there is clear evidence that it could have had an impact, Minneapolis-St. Paul case probably says it best, more eloquently than I can. It says, a litigant, this is a quote, who engages in misconduct should not be permitted the benefit of calculation, which can be little better than speculation, as the extent of the wrong inflicted upon his opponent. And that's precisely what happened here. So in this instance in particular, the two documents I've questioned is very straightforward. There's a license agreement between Emergence and Mr. Thorner on the prior Thorner patents. And there was an offer letter from Emergence to Mr. Thorner to acquire his patents at a royalty rate of 15%, counting a payment at a maximum of $1.5 million. Those documents do speak to issues which were impacted at trial. Emergence counsel didn't just make a passing statement at trial. There were probably three, four, perhaps five minutes of set-up discussion. But you are nonetheless then in this argument stressing that it could have affected the result, rather than a pure matter of, let's call it discovery, misconduct, or without trying to put loaded words into the description and trying to separate the issues of whether it would or would not or could or could not have affected the result, because you are nonetheless arguing that it could have affected the result, rather than that it was discovery, misconduct. Yes, I'm trying to make the point that it very well could have. And that's what makes it unfair, because we'll never know. I'm trying to get the point across that it was a dramatic impact to Sony and little consequence, Emergence will say, and it could have affected the result. So once that discovery conduct was found, then as a matter of law, the court must determine, did that afford Sony a full and fair opportunity to defend itself in court? And we would say on any standard, on any level, that it's certainly unfair to allow an adversary to make comments to a jury explaining, very simply, the prior art is bad, because there's no license whatsoever, a statement that was not found to be false, because there was no evidence whatsoever of success, a statement not found to be false, and not give Sony's counsel as trial counsel an opportunity to tell the jury, ladies and gentlemen, you heard Emergence counsel make arguments, those statements were false, and in fact, there was one license. That license was with Emergence itself. It didn't want you to know about it, because it is so significant that it felt that prior art that Sony's experts would tell you would validate the patents, it's telling you that one license that it had related to its technology. So it shouldn't matter, Your Honor, what impact the court believes ultimately it would have had. The only test is purely one from a legal standpoint. Is it fair for Sony, and did Sony get a full chance? Well, certainly Sony would get a full chance. In terms of, you refer to misconduct, I mean, the judge kind of wasn't that charitable to either party, in this case, in her opinion. It was a little bit of a plague on both your houses for dealing with Mr. Thorner. I mean, he was sort of the fly in the ointment here, wasn't he? Your Honor, 100% correct. And she said, basically, this was just—I mean, I didn't see a clear, definitive ruling of misconduct towards either party. She just said, you know, both parties made their very direct line. Well, here's where I would disagree with Your Honor's statement. I mean, it's very clear from statements of record that she found very clearly that Emergence engaged in misconduct. And she also made statements disapproving of Sony's treatment of Mr. Thorner. If necessary, we can address those. I believe they're wholly irrelevant to the issue today for this reason. Those allegations, which were found without an evidentiary hearing, without speaking to a single witness, without speaking to Mr. Thorner or any of 12 corroborating witnesses or Sony's representative, those allegations happened some two years after Emergence's misconduct, which was found. I'll point you, Your Honor, where in the record she found it. And those allegations happened some six months after a jury verdict. The trial was done and over with. Emergence's misconduct and the unfairness to Sony, depriving it of a full and fair opportunity, have already occurred. Now, granted, you're correct. She essentially found a plague on both of your houses. But that possibly cannot excuse the fact that Sony did not have a full and fair trial. Had Sony had a full and fair trial, there would have been no Rule 60B issued two years later. What the district court found, Your Honor, in terms of Emergence's misconduct is the following. But didn't her finding of Emergence's misconduct in turn, wasn't there, she made some findings about Mr. Thorner not being credible. She did. And doesn't that impact Sony's case in terms of the prior conduct? Well, the equities of all. In terms of one, you know, he who comes to court with seeking equity should have clear hands from that perspective. Those findings of Mr. Thorner's credibility, again, were made without an evidentiary hearing, without speaking to Mr. Thorner or anyone else regarding that story. But in fact, because those findings were well after the trial was over. She can't forgive Emergence for its misconduct. The law is still, even if we assume that Mr. Thorner wasn't credible, the law is still, Sony must have been afforded a full and fair opportunity to litigate, to defend itself. And the findings that Emergence withheld documents which squarely contradicted its trial counsel's closing statements to the jury, which were driven home by a PowerPoint presentation. A slide showing a false statement that there was no evidence whatsoever of any success, because we beg to differ. An offer to purchase a patent for up to a million and a half dollars at a 15% profit share is certainly some evidence. And certainly no license whatsoever, when Emergence is the only company in the world that had a license. Those findings of misconduct can't be condoned by this court or frankly by the district court. So she did find that, Your Honor. But we again submit any findings that happened two years after the event of Emergence's misconduct and six months after trial. Cannot say, well, we're going to wipe some of the slate, because some would have had a fair trial. We might not be here today. Well, you've emphasized the importance from your perspective, of course, of the licensing agreement. But the trial judge specifically says, in her opinion, that after analyzing this and having sat through the entire trial, much more familiar with this case, obviously, than we are, that at the end of the day, the offer and agreement's probative value with respect to the issue of commercial success is slight. That would seem to suggest that the impact on your ability to litigate this case fairly was not great. How are we going to look behind that kind of a conclusion made by the trial judge who has sat through the entire case and have a much better sense of how all the pieces fit together than we would? Your Honor, I have two responses to that question. And the first is, the district court judge also, in addition to making erroneous legal conclusions, she made some clearly erroneous factual findings, and that being one of them. And we don't need to— I wonder if that's a factual finding. That's an exercise of judgment based on information gathered over a course of time. I mean, it's not like saying that I hereby make a factual finding that the patent issued in 1962. This is a question as to the relative weight of particular pieces of evidence, and that seems to me to fall into the abuse of discretion category, as opposed to saying, well, there's clear error here because we disagree. We just think she's wrong. Your Honor, what that does, first off, is it goes into, again, where I started. There's a weighting standard she put in. How much of an impact did those comments that Emergent's counsel made in this closing argument have on the jury? How much of an impact did it have that somebody's trial counsel couldn't stand up when it was his turn to close and say, ladies and gentlemen, the statements you heard from Emergent's counsel about no license whatsoever that's a false statement. This prior article has a license. Emergent itself has one. Amazing. This letter about the commercial success, they say there's no evidence whatsoever. Emergent was interested enough to offer him up to a million and a half dollars. That's a false statement, too. We won't know, and that's why Minneapolis St. Paul makes it clear. The Supreme Court has given us a clear mandate. The court I read from, we can't engage in a balancing act of giving the world toward that. I understand that, your argument about this. There's a different standard here, but it does seem to me that when you're asking the question of whether someone has been deprived of their right to a full and fair opportunity to defend, what you're really saying is, did this have a significant effect on the proceedings? It's really just another way of packaging the same point. So whether you call it prejudicial or whether you call it significant impact, you're really saying that it impairs the ability to defend. It really seems to me to be essentially the same thing, isn't it? I think not, your honor. I would submit this. Let me put it this way. Assume if I were to conclude, as the district judge said, that a particular event had no discernible impact on the trial. I sat through the entire trial. I'm completely convinced it had no impact or at most a negligible impact. You wouldn't argue, would you, that it nonetheless deprived one of the parties of their opportunity to defend themselves? Your honor, even under those facts, which are far from the ones before us, but are not hypothetical, it's a hypothetical which we would deal with in this fashion. Yes, because it's not just the impact at trial. What about discovery prior to trial? There are statements of record by Stoney's counsel, outside trial counsel, and the head and side counsel responsible for litigation, that had they known that there was an actual license agreement between Immersion and Mr. Thorne, they would have made a different strategic decision as to pursuing discovery. And the whole 60B issue was because there was other prior art, non-patent prior art, that Mr. Thorne had. There was 50-some-odd prototypes that were brought into court. The district court judge didn't consider them, nor any of the witnesses that would corroborate them, but perhaps Stoney would have found through discovery. So Stoney should have a full opportunity before fairness means explore everything, not just at trial for the jury, but that's part of discovery. So even under this hypothetical, where it would have no impact whatsoever, facts that we don't have, yes, Stoney was deprived of a full opportunity. Fairness, which is in addition to fullness, certainly, Your Honor, by any standard imaginable, if trial counsel of an adversary is permitted to intentionally withhold documents, enter a license agreement seven weeks before Stoney serves a discovery request seeking them, withhold the license agreement, water down responses to requests to admit to suggest that all that existed was a possibility and no such document existed, have a witness claim privilege so you can't find anything about it, and go into trial and make a false statement to say, as to this prior art, it's bad because there's no license whatsoever, and that statement's false, we won't know the impact on the jury, but it had some. And the district court judge, Your Honor, found in particular this. She found that, yes, it could have been used to rebut a small part of a merchant's counsel's closing argument. I disagree. I think it's a huge part, and I say this wholeheartedly. I'm not just saying this as an advocate. I'm saying this because if I was trial counsel and my adversary made statements of that nature, false, denigrating the prior art about no license when it's untrue and no evidence of commercial success when they offer the money, I would sit there tasting the champagne. I would stand up when I had my turn and say, ladies and gentlemen, and I would make big fanfare over it. Those statements were false. It was so important to a merchant to state there's no license whatsoever. That's why the prior art is bad. They want you to believe there's a secondary indicia of obviousness, commercial success, et cetera. Well, guess what? Those statements are false. I waived that license agreement, and I would have it handed out. I would be thrilled to death. I believe I would have got a different result. I don't know that. A merchant will argue the opposite. No doubt is that you will get up and say, your Honor, no, no, small impact. The district judge is right. It doesn't matter. But how could that be fair by any standard? It's not fair. It's not fair to pay attention without. As we stand here today, a merchant has postured no excuse whatsoever. Why did it refuse to give that document? I saw a bunch of statements in the pleadings in the briefs here at the district court level. Well, there's objections, broad objections. That's not the test. The test on Rule 34 is very clear. They are certainly welcome to make broad objections, but they have a relevant document that doesn't squarely fit an objection, and they don't put it on a privilege law. They're obligated to work with candor under our federal court system, under our rules of civil procedure. Rule 34 says give it to them. And we were entitled to it. We were entitled to use it to refute that statement I tried. We need to move on. We'll save you some rebuttal time, Mr. Gerlitz. Thank you very much, Your Honor. Mr. Chu. Good afternoon. Morgan Chu on behalf of the merchant. May it please the court, I want to address two of the arguments put forward by opposing counsel this afternoon and some arguments related to them put forward for the first time in their reply brief, and then to address a third point regarding the venture case that they made for the first time in their reply brief. First, opposing counsel argued that under the circumstances of this case or any case, these documents had to have been produced. There was a document request, and the documents in question fell within that request. No question about that. There were objections. There was no statement that any documents would be produced. The record is very clear that the parties in this case on both sides sometimes said, here are our objections, but we're going to produce documents. Here are the documents we're producing. And on other occasions, both sides made objections and didn't produce, and that both sides sometimes made motions to compel. That's point one. Point two is the following. The argument by opposing counsel, as well as in their reply brief, is to create the illusion that the 722 patent was somehow critical, central, important, material, of relevance greater than slight. But let's see what the real record is. They mention that 722 was mentioned 29 times. It includes, cite our conference, many references just to the fact that it was incorporated by reference into the 818 patent. So when he called an expert on invalidity, Professor Salzberg, he testified at great length about the Thorner 818 patent. How many times did he even mention the 722 patent in his direct examination? How many? The answer is zero. Here is Sony's counsel's cross-examination of Professor Howe from Harvard University, who is a versions expert on the validity of the patents in suit. Question by Sony's counsel. The 818 patent is the one that Dr. Salisbury principally relied upon. Do you recall that? Answer, I don't recall. I know he used it. Question. You don't recall that that's the one he had 95% of his slides relating to Thorner? Answer, I couldn't tell you. I'll take your word for it. Question. You reviewed Professor Salisbury's report? Answer, I did. Question. And did you notice in that report that 95% of his discussion of Thorner was the 818 patent, not 840 or 722? Answer, I'll take your word for it. By the way, that reference to the 722 is part of that count that I referred to earlier. Now at the end of trial, the way the closing argument proceeded, of course, the plaintiff went first, had its closing argument, then Sony had its closing argument, and then there was rebuttal closing on behalf of the plaintiff. When Sony's counsel got up and had an extensive closing argument on invalidity, he pointed to the Thorner 818 patent and other pieces of prior art, alleged AT&T products and other pieces of prior art, massagers and the like. How many times did Sony's counsel in closing argument refer to the 722 patent? Zero. How many times did Immersion's counsel refer to the 722 patent when it first got up to make its closing argument? Zero times. In fact, that one passage, which consists of a one-word title and one sentence, in approximately 20,000 words of closing argument by Immersion's counsel, did not refer to the 722 patent. Earlier there was discussion by Immersion's counsel of the 818 patent. And let's look at what exactly was said. And this is key, because it is directly at odds with argument made in the reply brief by Sony. There was a slug. The slide in Sony's brief isn't complete, it has three-quarters of the slug. The fourth part, which is apparent from the closing argument, is Sony's single-shot controller, its first controller that had vibration, briefly introduced into the United States, withdrawn, and then replaced with the infringing dual-shot Sony controller. In the argument, Immersion's counsel said, well, there's the failure of others, there's commercial success of Immersion's patents, and other factors to be considered. And then the following was stated, quote, Thornhill, there's an evidence, despite the fact that he got a patent, notice it's a patent, it's not Thornhill, of any sales or success or licensing whatsoever, in contrast to the Immersion patents. That's it, that's the reference that they're complaining about, arguing about. Now, what's interesting in their reply brief, at page eight, do they respect what was said about the one Thornhill patent, which was plainly from the record as a whole, the 818 patent? Here's what they state, quote, In particular, Immersion's counsel had argued that although Mr. Thornhill had obtained prior art patents, there was no evidence that Mr. Thornhill's inventions had enjoyed any sales or success or licensing whatsoever, in contrast to the Immersion patents, end quote. Well, maybe someone just made a careless error, that can happen, let's see whether. They say on the next page nine of their reply brief, quote, Thus, Immersion's counsel was able to argue at closing that there was no evidence whatsoever that the Thornhill prior art patents had ever been licensed. And then he goes on further in the same page, quote, referring to Immersion's counsel, quote, He made the very clear and specific assertion that the Thornhill patents had never been licensed, end quote. I counted at least six references in the reply brief, always using the plural patents, where the statement on which this argument is based, where the focus has been on that one sentence, it was clear there was a reference to a patent. Now... Mr. Drew, straighten me out on where this is taking us, because your opponent says they didn't know the patent was licensed, or a patent was licensed. If they didn't know, how could they have built a case on that premise? Their argument today, as well as in their brief essentially, is that this was an important part of the case. The 722 patent was the validated prior art. Their argument is that they didn't know. Whether this would or would not have been important, they tell us, we don't know. So we need to go back this one step and somehow fill this gap. That is a part of their argument, Your Honor. But it is coupled, obviously, it must be coupled, with their position that the 722 patent was irrelevant. Say Mr. Thorner had a patent on bicycles, totally different technology, and he got $5 million and requested documents on the bicycle patent. Now you might say, OK, this is different. It's not on bicycle. And they didn't accept it, and they didn't know, apparently no one disputes. But at that stage, they didn't know. What are you asking us to infer from all of this? That nonetheless, because they didn't know, these statements are irrelevant? I am saying the following, which is slightly different from what Your Honor's question incorporates. The 722 patent, the disclosure, there is the question of the degree of its relevance. Because only if it is relevant... You agreed when you started right out that it was within the scope of the discovery request and was not produced, and we're not going into why it was or was not produced. But one of the objections, and the basis on which it was not produced, was that it was irrelevant. Let me explain briefly what the 722 patent concerned. It involves something called audio analysis, which basically is the translation of signals for sound into viral tactile feedback. That was not relevant for this case. Sony was not accused of practicing any of that technology. The immersion patents do not concern that technology. Indeed, immersion zone conduct shows that. If it had rights that were relevant for Sony's infringement of the 722 patent, then one would think that immersion would have asserted that patent along with the other two patents in suit. But I don't remember getting a sense throughout the briefs that either side was arguing that the reason the agreement with Thoner was not produced was because the subject matter was not related to this case. It is argued in the briefs by immersion that there was an objection on relevance, there were other objections, and that it was not relevant to this case. There is direct argument, Your Honor, in connection with the briefs, and in Sony's brief... As for this patent, but the other patent, I don't believe it's argued that the entire subject matter of the agreement with Thoner was not relevant to this case. You're saying that part of it is. Is that right, that the 722? Perhaps it's not well argued, Your Honor, but let me explain the background, which I believe is set forth in the briefs. You have the Thoner 818 patent. There's another patent, the 840, which accounts for 5% of the 95% that Dr. Salisbury relied upon. And then there is 722. The 818 patent was not cited in the record before the Patent Office for the first of the two immersion patents, the 213 patent. The other two Thoner patents were. The disclosures have some overlap, but 818 has disclosure that is different from what is contained in the 722 patent. So no question, at trial, the 818 patent is relevant. And what is occurring in the argument now is that Sony is saying, well, that somehow they were hurt at trial because of their lack of knowledge of a license to the 722 patent. But when they looked at the Thoner prior art, including 818 and 722, and the disclosures, because you have to have a relevant disclosure, they argued vociferously the 818 patent, but not the 722 patent. So on arguing, they demonstrated by their own argument the lack of relevance of the 722 patent, and hence the lack of relevance as to whether there was or wasn't a license agreement. But that doesn't really cross any border beyond the scope of the discovery request. What I just said doesn't answer directly the scope of the discovery request, but here's what the discovery request issue is. They can request a lot of things, some of which are relevant, some of which are irrelevant, some of which are privileged. It's perfectly fine for a party to say, we object and we're not going to produce anything, and we object in part because we think you're requesting irrelevant documents. If they're sufficiently interested, then there's a meet and confer process by the local rules. They can ask questions, are you withholding anything? What are you withholding? Can we negotiate something now? And then if we can't agree, we make a motion. And that occurred numerous times going in both directions in this case. I'm saying that by their conduct, they were showing that the 722 was not relevant even for discovery. And second, at trial, it was not relevant because they didn't rely upon it. And then third, they're taking this one sentence in closing argument, which refers to a Thorner patent in the singular, and trying to squeeze and transform that into a reference to the 722 patent. I did want to go to this third point, because it's important and we didn't have an opportunity to address it. It comes up first in the reply brief by Sony. They are making an argument based on this court's decision in the Venture Industries case. They are saying, in essence, and let me get an exact quote, that prejudice from misconduct is presumed, and the party committing the misconduct must show that there was no prejudicial effect, end quote, cite to the slip opinion, and that this, quote, was consistent with the Ninth Circuit standard. And then it goes on. So they're saying the burden shifts, there's a presumption and the burden shifts. Well, there are two problems at least with that. That Venture Industries case was based on Sixth Circuit law, which they do know. But second, they failed to note that this court's decision in Venture Industries stated plainly that the rule is different in the First Circuit, the Third, the Fourth, the Fifth, the Eighth, the D.C., and the Ninth Circuit. So their argument that somehow the burden has shifted is based on, I'll call it, their argument or portrayal of this court's decision in that particular case. In short, Your Honors, I do not think the statement in closing argument referred to the 722 patent. It was not a material part of the case during trial as opposed to perhaps some other proceedings that could have taken place. And finally, they have not met their burden by clear and convincing evidence to show that the district court was wrong or that it abused its discretion. Thank you. Thank you, Mr. Chiu. Mr. Gerhold, that's two minutes. Thank you, Your Honor. Your Honor, a substantial part of Mergent's counsel's argument was going to the fact that somehow the 722 patent was irrelevant. And I think the clearest way to address that is that the district court considered that exact argument that Mergent's counsel made at the Rule 60B hearing. The district court judge's way she dealt with it, in fact, the quotation is that argument is disingenuous at about 38 of the appendix. In fact, the district court judge found the license agreement in particular is relevant to Mergent's assertions at trial that Mr. Thorn and other prior art inventors were commercially unsuccessful. Mergent claims that the 2003 agreement had nothing to do with prior art because Sony did not rely on the 722 patent for its invalidity case at trial. This statement, like the defendants in Canada, is disingenuous. During the summary judgment briefing, Sony did rely on the 722 patent, which Sony argued disclosed the pulsing-to-decouple element of Mergent's patents. Furthermore, the 722 patent was incorporated by reference into the 840 patent, which Sony did rely on at trial. So to the extent Mergent's trying to rekindle an argument which the district court found to be disingenuous, it certainly should have no place in making a determination now that those statements were irrelevant and that the license agreement had to be irrelevant. The argument's been rejected squarely. Mergent's counsel also acknowledged, as he argued in his case, that there was overlap between the 722 and the other patents. It was incorporated by reference. The other patents, yes, they added some new subject matter. So when you focus your case at the final trial, the patents are somehow redundant and there's new subject matter in one, you don't continuously refer to the jury to confuse them for multiple patents. Lastly, Your Honor, as far as the Venture case, this was a case that Mergent was trying to rely on in his red brief. And we recognize the Ninth Circuit doesn't shift the burden to Mergent. But what the Ninth Circuit does and what the United States Supreme Court has required to state, once there's a discovery violation, which Mergent's counsel, such as the one here, has not refuted, a withholding of documents, statements made at trial about licenses, commercial success, both proving them to be false and depriving someone of that opportunity, that's not a full and fair opportunity. And this Court, which we all look at for guidance in setting the standard, setting the bar, even above the district courts, cannot condone admitted discovery violations by a notion of refusal to give documents stating, well, we don't want to because of relevance. You're waxing eloquent and we have run out of time. But I think we have the positions as well as we can. Thank you both. The case is taken under submission. Thank you. The Honorable Court is adjourned until tomorrow morning, 10 a.m.